FRUGÉ, Judge.
This is a suit brought under provisions of the Workmen’s Compensation Act, LSA-R.S. 23:1021 et seq., by plaintiff-appellant, Sam Mouton, for total and permanent disability as a result of an alleged accident which occurred in the course and scope of his employment with Levert-St. John, Inc. The defendant is Travelers Insurance Company, the workmen’s compensation insurer of the said employer. From a judgment denying total and permanent disability, plaintiff appeals.
The plaintiff, a colored man by the name of Sam Mouton, alleges that he was injured on November 11, 1958, while working for Levert-St. John, Inc., Sugar Factory as a common laborer. He states that while pulling embers out of a boiler that he hurt his back. In his petition he alleges that he has sustained “severe” back injury, together with “possible rupture of an invertebral disc”, and that he has developed “post traumatic neurosis” as a result of his alleged injury. Plaintiff further avers that his occupation was a hazardous one within the purview of the Workmen’s Compensation Laws of the State of Louisiana, and that the accident occurred while he was in the course and scope of his employment, and that his injury has rendered him totally and permanently disabled and therefore he is entitled to weekly compensation at the rate of Thirty-Five ($35.00) Dollars per week for a period not to exceed 400 weeks, subject to credit of approximately ten (10) weeks payment of Thirty-Five ($35.00) Dollars per week, together with medical, hospital and pharmaceutical expenses in the amount of Two Thousand Five Hundred ($2,500.00) Dollars. The defendant’s position is that the plaintiff has nothing wrong with him and is a malingerer.
Since it is plaintiff’s contention that he is unable to return to his work by reason of disability, we will explore this contention fully. First, we will discuss the various medical reports chronologically, without regard to separation into plaintiff or defendant doctors.

Dr. Louis Weinstein:

Although plaintiff alleges he was injured on November 11, 1958, the first record of his having seen a physician is that on November 15, 1958, he consulted his family physician, Dr. Louis Weinstein, of Arnaud-ville, at which time he complained of back pain and stiffness. Dr. Weinstein examined him and found nothing. He found no muscle spasm. He found no evidence of ascroiliac sprain or any other back injury. Fie found no objective signs whatsoever that Sam Mouton had received any sort of injury. He felt that Sam Mouton was putting on an act.
Plaintiff returned to Dr. Weinstein for treatment on numerous occasions thereafter. Dr. Weinstein did not see fit to discharge him since there was a possibility that there could have been something organically wrong with Sam Mouton, and Dr. Weinstein apparently wanted to give plaintiff every benefit of the doubt. Since Mouton was apparently still complaining of back pain, Dr. Weinstein gave him injections for pain and muscle spasm on the second visit, although he still was not able to find any sign of injury. Dr. Weinstein understands French and understood all of the complaints *289 that Sam Mouton made to him. (Sam Mouton speaks no English.)
Dr. Weinstein stated that he attempted to discharge Sam Mouton three or four times but called an attorney in St. Martinville, who was then apparently representing the plaintiff, and that the attorney instructed him to continue with the treament. Dr. Weinstein further stated that he advised defendant insurance company that Sam Mouton had nothing wrong with him, but that the company advised him to continue the visits to insure the fact that the plaintiff would not later return with complaints.
Nevertheless, plaintiff continued to tell Dr. Weinstein he had hack pain, and the examinations continued to be negative. Dr. Weinstein found that plaintiff was attempting to deceive him. One of the interesting things found by Dr. Weinstein was the fact that he personally observed that Sam Mouton would come to him “bent forward” and during their discussion when his mind was off his injury, would straighten out. He further observed that when Sam Mouton would later leave his office that he would begin to walk straight and would drive his pick-up truck. Dr. Weinstein did not stop his tests here. He stated that in attempting to further determine whether Mouton genuinely had anything wrong with him, he gave him an injection of plain water, and Mouton said he felt better. All of this convincing evidence led Dr. Wein-stein to conclude in his unqualified opinion as a physician that Sam Mouton had been “a malingerer all the way through”. Dr. Weinstein further concluded that that employee was capable of returning to any work that he was capable of performing prior to his alleged accident of November 11, 1958.
As to plaintiff’s sincerity and the validity of his injury, Dr. Weinstein concluded: “I always thought he was faking.” It is interesting to note further that Dr. Wein-stein treated Sam Mouton for many years before November 11, 1958, and found that Mouton “never did have too much of anything”, but yet would complain and exaggerate a little.
Although Dr. Weinstein is not a psychiatrist, and was not offered by defendant as such, in answer to questions on cross-examination concerning the possibility of plaintiff having a traumatic neurosis, he replied in his opinion that if plaintiff had any neurosis, he had the neurosis before the accident, and he did not believe that the accident in any way brought about a neurotic condition. Dr. Louis Weinstein is a country doctor who practices in Arnaud-ville; he was obviously not a very “sophisticated” witness, but a reading of his education and qualification shows that he is well qualified as a physician, and has had particular experience in dealing with malingerers while a physician in the armed services. It is the conclusion of Dr. Weinstein after many tests and numerous examinations that Sam Mouton was a malingerer and a faker.

Dr. Bernard deMahy:

The plaintiff was examined on November 20, 1958, by Dr. Bernard deMahy of St. Martinville, nine days after the alleged accident. Although Dr. deMahy at that time made a diagnosis of “possible” lum-bosacral strain, there were no objective findings on physical examination, and the examination was essentially negative. He stated that he found “no objective evidence” which would account for plaintiff’s condition. X-rays were negative and he did not feel it necessary to hospitalize the plaintiff. Even giving plaintiff all benefit of the doubt, Dr. deMahy felt that he should be able to return to his regular work on or about November 30, 1958. He further stated:
“I couldn’t prove by physical examination that there was anything wrong with him. I didn’t find anything wrong with him by physical examination.” (Emphasis added.)

Dr. James Gilly:

Plaintiff was then examined on three occasions by Dr. James Gilly, an orthopedist of Lafayette. In his report of March 2, *290 1959, Dr. Gilly states that he examined the plaintiff on February 25, 1959, because of a low back complaint. No evidence of disability was found. There was no muscle spasm. The plaintiff stood well. There was no list of the spine. All tests were negative except the pin-prick test showed what was supposed as a stocking type of anesthesia, however, Dr. Gilly noted that this anethesia did not “follow any anatomical pattern”. Dr. Gilly concluded his first report:
“The absence of muscle spasm, complete movement in the spine with complete reversal of the lumbosacral curve indicate that the patient has recovered from whatever injury he received in November of 1958.”
The attached x-ray report by Dr. Lazard Klinger shows no evidence of any fracture, dislocation, bone or joint disease or spon-dylolisthesis.
Dr. Gilly again examined the plaintiff on April 23, 1959, and rendered report dated May 1, 1959; at this time the plaintiff said he not only had back pain, but radiation of pain into the left leg and left arm, and weakness into the entire left side of the body. Nevertheless, all tests were negative and Dr. Gilly again concluded that he could find “no orthopedic evidence of disability”.
Dr. Gilly’s third examination was on July 27, 1959, and report was rendered dated August 4, 1959. Plaintiff again said he had all sorts of pains, and again Dr. Gilly concluded unequivocally that he could find “no evidence of disability in this patient as a result of the injury he sustained in November of 1958”.

Dr. Edward T. Haslam:

Plaintiff was then sent by his attorney to Dr. Edward T. Haslam, orthopedist of New Orleans, Louisiana, who rendered report to plaintiff’s attorney dated August 30, 1960. Dr. Haslam found that although the plaintiff complained of pain on many parts of the examination, that his examination was objectively “within normal limits". He states that the plaintiff’s reactions to the various tests performed “were inconsistent with either a ruptured disc or a low back syndrome and suggests either psychogenic factors or exaggeration”. Dr. Haslam concluded : “ * * * I was unable on this examination to find anything to allow me to establish an orthopedic diagnosis to explain his persistent complaints.” (Emphasis added.)

Dr. Raeburn C. Llewellyn:

Plaintiff was then sent for examination by his attorney on February 9, 1960, to Dr. Raeburn C. Llewellyn, neurosurgeon of New Orleans. His examination revealed no muscular wasting and no loss of strength. Dr. Llewellyn stated that the showing of pain made by Mouton led him to believe that there should have been “more positive findings” than he found. Dr. Llewellyn stated that Sam Mouton had a “low tolerance to pain”. Dr. Llewellyn admitted that his positive findings were “chiefly subjective”, and that he did not find any evidence of muscle spasm. He did not completely exclude the possibility of a disc injury, but said that a myelogram should be run before this possibility was excluded. However, he did go so far as to say that he was “not able to make a specific neurological diagnosis * * * ”, and he continued: “the findings were not of the character that would allow me to make a purely clinical diagnosis of a disc lesion.” (Emphasis added.)
On cross-examination, Dr. Llewellyn stated that he examined plaintiff purely for medical-legal reasons. He stated: “The patient’s general reaction to his situation or to whatever particular condition he may or may not have was of the type and caliber that would be interpreted by me as that of a person who is a malingerer.” (Emphasis added.) He further stated that he felt this was a legal determination and not a medical determination and consequently would not give a specific opinion as to whether Mouton was or was not a malingerer. Pie stated that he would rather rely on a myelogram to determine whether or not a disc was actually present than to assume that the plaintiff *291 was “100% fraud or 75% fraud or 25% fraud”.

Dr. Dabney Emin:

Defendant caused plaintiff to be examined on May 19, 1959, by Dr. Dabney Minor Ewin of New Orleans, a specialist in general and traumatic surgery. In his examination Dr. Ewin found no abnormality of gait, no muscle spasm and found that plaintiff dressed and undressed without assistance. The x-rays were normal.
Dr. Ewin conducted a lengthy series of tests to determine disability, which compelled Dr. Ewin to the conclusion that Sam Mouton was “attempting to deceive” him. When the pin-prick test was conducted, he found that there was “objective evidence” that Sam Mouton could feel the pin prick, although Mouton tried to deny it. Dr. Ewin’s discussion of the plantar flexion test on pages 11 and 12 of his deposition recites how Mouton would complain of' pain in the back on flexion of the ankle, when there is no medical possibility of there being any correlation between flexion of the ankle and pain in the back. He felt this was further evidence that the plaintiff was “attempting to simulate his complaint”. The straight leg raising test led Dr. Ewin to the same conclusion. Beginning at page 13 of his deposition (Tr. 262) he states:
“Q. Doctor, as a result of your examination, did you find any obj ective evidence whatsoever of disability or abnormality of the low back? A. No.
“Q. Did you find anything whatsoever which would account physically for the patient’s complaint of back pain? A. No.
“Q. Did you feel that the patient was in fact really having back pain?
A. It was my impression that he was not.
“Q. Did you feel that Sam Mouton was being truthful with you during the examination, or did you feel he was attempting to deceive you in regard to his complaints ? A. I felt that he was attempting to deceive me.”
He unequivocally stated that in his opinion Sam Mouton “was making up his complaints”, and he actually went so far as to say that Sam Mouton was a "malingerer”.
He further stated that he did not believe that plaintiff’s complaints in these circumstances should be attributed to a neurotic disorder. He stated:
“A. I would say this: that I specialize in trauma, and I think that I encounter the problems that are involved in evaluating any kind of patient as to what his entire status may be, and I think I can comment on an opinion, regardless.
“2. And what is your opinion, Doctor? A. The abnormalities that this particular patient exhibited, without commenting particularly on any neurosis he may have had or may not have had, the abnormalities that he demonstrated in his examination were those of an intentional effort to deceive, and intentional effort is not a neurotic disorder. (Emphasis added.)
“Q. If it were a neurotic disorder, what would the symptoms be? A. I don’t know what they would have been in his particular case, but I can use an example. Say a man has a traumatic neurosis in which he is paralyzed in one leg. You could take this man and push him off a step and he would not reach out to protect himself from falling with that leg. This would not stimulate him to guard with that leg. To all intents and purposes he actually is paralyzed in that leg and he would fall. Whereas a man who is malingering in this situation might very well inadvertently protect himself as this man did when he got stuck with a pin.
“Q. And therefore, on that basis you would differentiate between a true neurosis and a person who is malingering? A. Well, the findings that this patient complained of to me as the cause of his disability were those of a malingerer. (Emphasis added.)
*292 “Q. Then, Doctor, you did not feel that there was anything whatsoever organically wrong with Sam Mouton as associated with a residual or trauma to the low back? A. That is correct.
“Q. Did you feel that Sam Mouton was magnifying his complaints? A. My impression was that he was making them up.
“Q. In other words, going still further, would you go so far as to say that Sam Mouton was a malingerer? A. Yes, that was my opinion.”

Dr. Howard Karr:

The plaintiff was examined in neurological examination on May 19, 1959, by Dr. Howard Karr, neurosurgeon of New Orleans. He very succinctly stated that Sam Mouton possessed no abnormality of gait, no restriction of movement, no muscle spasm, no signs of recent weight loss, and removed his clothing without difficulty. His reflexes were normal. When the touch stimulus test was applied, Sam Mouton withdrew though saying that he couldn’t feel the pin prick. Dr. Karr states it is “impossible” for a sensory loss to work over half the body resulting from a nerve root lesion. He stated that Mouton “didn’t have any findings, period”. He felt that the plaintiff was attempting to deceive the examiner, and he further felt that Mouton had “no condition which required any treatment”. He concluded in his unqualified opinion that Sam Mouton had no mechanical or neurological disability whatsoever.
Further, Dr. Karr felt that Sam Mouton was not being honest, and on repeated questioning on cross-examination stated in his opinion that plaintiff was a “fraud”. He further felt that Sam Mouton’s case did not fall into the realm of traumatic neurosis. In a down-to-earth fashion, Dr. Karr stated that it required merely “ordinary common sense” to evaluate the motivational factors in this case.

Dr. A. Scott Hamilton:

As of this time all the medical testimony has gone against plaintiff. No one could find disability. On March 14, 1960, plaintiff was sent to Monroe, Louisiana, for an orthopedic examination by Dr. A. Scott Hamilton. Sam Mouton related to Dr. Hamilton that he had been turned down by the Army, for some reason. He also recited that farming (rather than boiler room work) was his usual occupation. Dr. Hamilton found that Sam Mouton’s hands did not tremble and the x-rays were completely normal and negative.
Dr. Hamilton found that the plaintiff needed no assistance in undressing. The bowing test was negative. The viet’s test was negative. Percussion (apparently a striking of the back with some object) did not cause pain. Dr. Hamilton states several times that he found that a shift of weight caused muscle spasm. A reading of this testimony might lead one to the conclusion that the spasm was voluntary.
Dr. Hamilton stated all the way through that he understood no French and wasn’t quite sure of Sam Mouton’s responses since Mouton spoke no English. He found that the “mechanical” condition of the lower back was normal, and the doctor admitted that he “wasn’t quite certain” whether plaintiff had nerve root irritation.
Although none of the physicians and specialists who had seen Sam Mouton felt that he had a ruptured disc or any disability, yet this physician apparently felt that “he didn’t arrive at a definite diagnosis”, but thought the most “likely” explanation was a ruptured disc. However, he did make it plain that he was not at all certain what the plaintiff had, and recommended a myelo-gram. He admitted that he could not say one way or the other whether Sam Mouton had a ruptured disc. He definitely did not believe Mouton was a malingerer.
Plaintiff was observed on October 11, 1960 by Dr. Gene L. Usdin, a psychiatrist from New Orleans. This was a one hour examination and because of the language barrier an interpreter was used. The diagnosis, according to Dr. Usdin, was anxiety-psycho neurosis with the possibility that *293 Mouton’s back symptoms might be on the basis of a conversion hysteria or psychoneurosis. By that Dr. Usdin explains that the patient may have had a lumbosacral strain initially, or may have symptoms of an organic basis. Dr. Usdin further stated that this diagnosis meant that Sam Mouton was suffering from neurosis following trauma, which is commonly called “post-traumatic neurosis”. It is interesting to note the following testimony given by Dr. Usdin:
“Q. And my question would be whether or not if you had a more sufficient and thorough medical history and background on this patient, whether or not it might well change your opinion ? A. I think in this or any patient that one sees for an hour, that the psychiatrist could benefit by more time, more visits, more consultation with each of the other physicians. I think any opinion would be enhanced by the opportunity to have a twenty or thirty minute discussion with each of the eight doctors. My opinion would be more secure had I been able to see this patient five or six times instead of one visit; my opinion would have been more secure had I been able to secure some psychological tests; my opinion would have been more secure had I been able to interview each of the members of the family or persons who knew him prior to and following the accident. The psychiatrist’s participation in these cases is a difficult thing.
“Q. In other words, you based your opinion on what you had, and if you had additional information that you would very conceivably change your opinion one way or another; is that correct ?
$ sfc s|e aft -fa
“A. It could influence me, stronger or weaker, yes.”
On November 10, I960 Sam Mouton was examined under similar circumstances by another psychiatrist from New Orleans, Dr. Marvin Miller. In answer to a question, he testified as follows:
“Q. What history did he give you, sir? A. Mr. Mouton, through the services of a friend of his who acted as interpreter, described an accident, in which he was injured on 11/8/58. The accident, as he described it, involved his having to use a long hoe of approximately fourteen or fifteen feet. During the course of this work, he slipped on the wet floor and said that he wrenched his back. This gave rise to pain in his low midback. That is essentially what he told me about the accident. I can go on with the rest, if you care to.
* * * * * *
“Q. Again, Doctor, do you feel that his complaints of pain and incapacity are real and genuine to him? A. I have absolutely no reason, in the light of the facts presented to me, to believe otherwise.
* * * * * *
“Q. But there is a way to test whether or not the patient is attempting to deceive you in giving the complaints, isn’t there? A. No, there is no way of testing this. The only way that I would know of its being possible to verify or not to verify complaints would be in the case of an individual who, for example, walks with a limp upon entering the office and says that the limp is a function of severe hip pain, and who, upon leaving the office and is under the impression that he is not being observed, immediately thereupon straightens up and left with a normal gait. The presence or absence of pain without physical or muscular reflection thereof, is in my opinion impossible to test. ‡ i\l i}i
It is interesting to note that Dr. Wein-stein observed plaintiff’s marked “recovery” after Mouton was out of the doctor’s office and safely away from observing eyes.
*294 Lay Testimony
In addition to the host of medical witnesses plaintiff himself testified and had several of his relatives testify also in attempting to show that he has been disabled. We will briefly review the salient points of the testimony. Sam Mouton admitted that his regular work was farming and that he had worked for St. John for only two winters. He recites that a very simple little accident happened to him on November 11, 1958. He stated: “A moment before leaving work on the last boiler we were cleaning, I twisted my back with the hoe. That’s when Joseph M. Charles told me to sit aside and he would continue, and he would finish cleaning the boiler. A little while after we quit. I left.” He denied that he had been doing any work since November 11, 1958. He says he could not work even in the yard.
We note that this job which he held for a grinding season and a half at St. John was the first outside work that this middle aged worker had ever had. When asked whether his back pain was all right, he replied no but he admitted: “It doesn’t bother me as much as at the beginning, but it hurts.” He said if he could “walk a little” it would help.
The record shows that Sam Mouton did very little during his life before the accident, and is not doing a great deal now. He admits that until he took the job at St. John, he supported his family by working on his farm and by doing odd jobs.
Plaintiff’s next witness was Joseph M. Charles. He was supposedly a witness to the accident, tie has been knowing Sam Mouton since Sam was a little boy. Sam Mouton’s wife is Charles’ niece. Charles says substantially the same thing as plaintiff’s other witnesses. Landres Calais, plaintiff’s brother-in-law, was plaintiff’s next witness to say that plaintiff had not been working.
Two other witnesses testified for plaintiff, namely Henry Broussard and Sam’s “common law” brother-in-law, Alfred Bernard; they testified that Sam had been a hard worker before the “accident”, but they had not seen him work after the accident.
Defendant’s first lay witness, Mr. Emile Girard of Breaux Bridge, is a man of considerable note and reputation in St. Martin Parish, and one of Sam Mouton’s neighbors. He testified that he saw Sam Mouton practically every day. He has known Sam from twelve or fourteen years. He testified that Sam Mouton “never did do very much” on his farm. He says that Sam Mouton is ‘‘not a worker for sure”. Concerning Sam and his brothers, Mr. Girard stated: “I can’t talk too much, but they’re not workers there. You can’t hire them. They don’t do anything there.” Mr. Girard offered to give Sam Mouton a job driving a truck and although Mouton promised to come he did not show up. Sam Mouton told Mr. Girard that'he felt he was physically capable of doing this work, but apparently Sam never did do anything. For example:
“Q. To your knowledge and from your personal observations, what has Sam Mouton done during most of his adult life by way of making a living? A. Well, he was farming. I’ll tell you the whole thing. When the father used to live, he had about six or seven boys. So on Saturday he’d give this fellow two dollars to buy some tobacco or buy overalls or clothing for the whole bunch, but none of them never did do anything there.”
Mr. Girard testified that he saw Sam Mouton driving either his car or his tractor every day, and that he would take his wife to work every morning at the canning factory, and would pick her up in the afternoon. He testified that he had seen Sam Mouton pick okra in his garden every other morning in the okra season. Mr. Girard never noticed anything peculiar' about the way Sam Mouton worked, never noticed any limp and did not notice that Sam Mouton appeared to be in any pain.
*295 On cross-examination, Mr. Girard, in answer to a question concerning the amount of work Sam Mouton had done before he worked for St. John, again replied: “Not much, but a little bit. Not much, a little bit.” He also stated that he had seen Sam Mouton pick cotton since the accident. He said he had seen Sam Mouton carrying a heavy sack of okra on his shoulders. He reiterated that Sam Mouton did not appear to be disabled, and stated: “He looked to be an ordinary man just like you or I walk. If a man is limping, you can notice that. But he had no appearance of limping or walking bad. He was just walking like any other person.” (Emphasis added.)
Defendant’s next witness was Weston Roy who saw Sam Mouton on his tractor plowing about two months before this case was brought to trial. He saw Sam Mouton with mules cultivating cotton about four months before the trial. He has seen him driving his truck and his car. Defendant’s last witness was Mr. Warren Leger, a farmer who lives in the Fifth Ward of St. Martin Parish, has known Sam Mouton since 1926. He said that Sam Mouton would work, but was not a hard worker. He said that it was his opinion that Sam Mouton’s working performance could not be compared to that of a hard working man. When Mr. Leger hired Sam Mouton to cut cane, he found that he was not a regular worker, but would work for two or three days or a week, then skip four or five days. Other than Sam Mouton’s job at St. John, Mr. Leger had never known Mouton to hold down a regular job other than the “little bit of farming” which he did. When asked whether Mouton was a good worker or was lazy, he replied he felt that Mouton had “neglected himself”. Pie said even before the accident that not more than once or twice a month did he see Sam Mouton working. Like Mr. Girard Mr. Leger had seen Sam Mouton pick okra and carrying a sack since the accident.
There is no doubt but that bona-fide posl traumatic neurosis has been recognized in Louisiana as grounds in a proper case for an award of total, permanent disability. Plaintiff bears the burden of proving, not only that he has a traumatic neurosis, caused by the accident, but that he is in fact disabled as a result of the neurosis.
The cases make it very clear that this neurosis theory, being very vague and nebulous, must be handled with a tremendous amount of caution. In cases where there is proof of malingering, our courts have been ready to accept such proof and to deny recovery to a malingering plaintiff. For example, in Castille v. Liberty Mutual Insurance Co., La.App., 123 So.2d 419, the plaintiff claimed to have a knee injury which prevented him from working. The medical testmony was in conflict, and the trial judge believed the doctors who said that plaintiff could return to work without pain, and discounted the sincerity of the plaintiff’s complaints of pain and disability. Recovery was refused and this refusal was affirmed by the First Circuit Court, Judge Tate as its organ.
In the case of Phelps v. Royal Indemnity Company, La.App., 77 So.2d 225, plaintiff claimed to have suffered a back injury and to have a ruptured intervertebral disc and traumatic neurosis. Five doctors could find nothing wrong with plaintiff. Plaintiff’s counsel then had three psychiatrists examine plaintiff. Two found traumatic neurosis, and one found no neurosis. Three of the medical doctors had felt that plaintiff had resorted to various shams to deceive them. In denying recovery, the court stated at page 227:
“And if this record contained no evidence except that which was offered by the three psychiatrists who testified after the case was reopened, we might have difficulty in agreeing with the finding of the District Judge who said that the record contained no evidence that the plaintiff suffered ‘an injury of sufficient intensity’ to cause neurosis or hysteria and that there should be no recovery.
*296 “If we had before us only the evidence of the three psychiatrists, we would find it difficult to determine from that evidence that the opinion of the one should prevail over the opinions of the other two, but from the record as a whole we conclude, as did the District Judge, that this claim is ‘a last minute afterthought,’ and that plaintiff is a malingerer and sustained no injury of any kind in any accident which occurred on March 24, 1953. However, it is interesting to note that not one of three psychiatrists who testified found any lesions or objective evidence of physical injury, although two who testified on behalf of plaintiff concluded that plaintiff was suffering from post-traumatic hysteria or neurosis. The psychiatrist who testified on behalf of defendant concluded that he was not so afflicted and that he was a malingerer.
“We cannot overlook the very significant fact that during the entire first trial no mention was made. of post-traumatic neurosis except that it was said that there was no claim that plaintiff had sustained any such neurosis and that his entire case was based on the contention that he had suffered a ruptured intervertebral disc. Nor can we overlook the fact that the evidence given during the trial indicated plainly that plaintiff was a malingerer and resorted to various shams in his effort to deceive the doctors into believing that he had been physically, injured. Five doctors found no evidence of the injury of which plaintiff complained and three, including a neurologist, were of the opinion that he was a malingerer.
“In view of the fact that, throughout his testimony, the plaintiff evidenced a complete unwillingness to tell the truth and, on several occasions, found himself enmeshed in a mass of contradictions of his own making, we can reach no other conclusion than that he was malingering and that his so-called neurosis or hysteria would miraculously disappear upon the rendition of a favorable decree.”
The facts in Corral v. Crawford Homes, Inc., La.App., 113 So.2d 820, 823, are very similar to the case at bar. Plaintiff complained of back pain and traumatic neurosis. Plaintiff’s attending physician testified he felt that from the start plaintiff was grossly exaggerating his complaints, as did the orthopedist who examined plaintiff. The psychiatrist thought plaintiff had a traumatic neurosis. The trial judge denied recovery, and Judge Tate, speaking for the First Circuit, affirmed the decision. The court noted that the evidence was that the plaintiff was not sincere in his complaints. The court stated:
“Of course, the skilled opinion of the physician, based upon the claimant’s response to recognized tests or otherwise, may be of material assistance to the trial court in what is ultimately its responsibility, rather than that of the medical witnesses — an evaluation of the sincerity and truthfulness of the claimant. And the opinion of a medical specialist within his field should properly control as to whether there can be a relation between the disability complained of and the industrial accident, or as to whether there can be an organic or psychiatric basis for plaintiff’s complaints, if same are accepted as genuine.
“But although the testimony of the medical specialist may well be determinative as the medical limits and possibilities of any work-caused disability, insofar as the ultimate conclusion of the medical witness as to a claimant’s disability is based upon his own evaluation of said claimant’s sincerity, the trial court is free to consider and accept other medical and/or lay testimony and reach a differing ultimate conclusion as to the sincerity or not of the claimant’s complaints of pain. * * *
“Similarly, in the present instance the psychiatrist (who saw plaintiff but *297 once and then four days before the trial in December, 1958) and the general practitioner (who examined plaintiff just twice, the first time 11 days before, and then, the day before the trial), admitted that ultimately their conclusion of disability was founded upon their acceptance of plaintiff’s complaints as sincere. We cannot say that the trial court committed manifest and reversible error in refusing to accept such testimony, upon its own finding that the essential predicate upon which these medical conclusions were based— plaintiff’s sincerity- — -was incorrect: since the trial court’s finding was based upon substantial evidence in the record contradictory of these physicians’ assumption of plaintiff’s sincerity; and also upon sound and detailed reasons based upon its own observation of the claimant during the trial and on the stand, specifically set forth for the benefit of the appellate court.”
There are many cases holding that courts should be very careful in giving an award based on traumatic neurosis owing to the nebulous characteristics of a neurosis. For example, in Franklin v. Cashio, La.App., 111 So.2d 536, 540, the court in denying recovery stated:
“It is also settled by the jurisprudence of this state that an employee who predicates a claim for total permanent disability upon neurosis induced by trauma hears the burden of proving by a preponderance that the neurosis exists and that it was caused by an accident occurring during the course of his employment.” (Emphasis added.)
In William v. White, La.App., 91 So.2d 83, at page 84, the Court of Appeal, First Circuit, stated: are not to be disregarded on appellate review unless manifestly erroneous;; especially when as here based upon the: credibility of witnesses, since the District Court saw and heard the witnesses and is in a better position that an appellate court to decide whether a version of an accident or a disability is nevertheless truthful despite contradictory testimony or contradicting circumstances.”
“If the function of an appellate court were to judge solely on the basis of the cold typewritten record without regard to the District Court’s findings, these forceful arguments might prevail. But the trial court’s factual determinations
We find that the decision of the trial court is not manifestly erroneous. After carefully studying the record, it is our opinion that essentially plaintiff has failed to prove his case, and that the findings of the trial court are correct.
For the reasons assigned the judgment of the lower court is affirmed.
Affirmed.